[Civ. No. 38627. First Dist., Div. One. June 7, 1977.]

FIRST CITY BANK, Plaintiff and Appellant, v.
FRANCHISE TAX BOARD, Defendant and Respondent.

**COUNSEL**

Landels, Ripley & Diamond, Frederick M. Pownall, William R. Pascoe and Byron J. Massey for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Ernest P. Goodman, Assistant Attorney General, and Charles Kobayashi, Deputy Attorney General, for Defendant and Respondent.

**OPINION**

**LAZARUS, J.**\*—Plaintiff First City Bank (hereinafter First City) appeals from a summary judgment denying its claim for a $4,999 tax refund paid to respondent Franchise Tax Board (hereinafter Board). Both sides moved for summary judgment on the basis of stipulated facts. First City's motion was denied. At issue was the question of whether a 2.5 percent tax on items of so-called "preference income" (see p. 448, *post*) in excess of $30,000 imposed on banking corporations under the

---

\*Retired judge of the superior court sitting under assignment by the Acting Chairman of the Judicial Council.

provisions of Revenue and Taxation Code section 23400 et seq. is constitutionally valid.

The basic tax structure relating to banks (both state and federal) during the 1972 taxable period here involved included a tax against banking institutions measured by net income at the maximum rate of 11.6 percent for the year in question. This was authorized by former article XIII, section 16, of the California Constitution, and the statutes promulgated thereunder.[1] The constitutional section provides in part:

"1. (a) Banks, including national banking associations, located within the limits of this State, shall annually pay to the State a tax, at the rate to be provided by law according to or measured by their net income, which shall be in lieu of all other taxes and licenses, state, county and municipal, upon such banks, or the shares thereof, except taxes upon their real property and, when permitted by the Congress of the United States with respect to national banking associations, motor vehicle and other vehicle registration license fees and any other tax or license fee imposed by the State upon vehicles, motor vehicles or the operation thereof.

"(b) The Legislature may provide by law for any other form of taxation now or hereafter permitted by the Congress of the United States respecting national banking associations; provided, that such form of taxation shall apply to all banks located within the limits of this State." (Cal. Const., art. XIII, § 16.)[2]

This was implemented by sections 23181 and 23182, Revenue and Taxation Code,[3] which, during the same period, read, insofar as

---

[1] General corporations are taxed at a rate of 7 percent of net income. But general corporations pay state and local taxes, including taxes on personal property. However, in lieu of all other taxes, except taxes on real property, banks in 1972 were subject only to a tax measured by net income. This was a two-part tax, part of which was at the basic rate of 7 percent imposed on general corporations, and a supplementary tax which was at the ratio which personal property taxes paid by general corporations bear to their net income attributable to California. The total tax rate at the time in question could not, however, exceed 11.6 percent (Rev. & Tax. Code, § 23186). Thus, the intent of the law in California was to equalize the tax burden on banks and other corporations and to impose a tax burden on banks no greater than the tax burdens on other corporations.

[2] Section 16 was repealed in 1974 and replaced by article XIII, section 27, the provisions of which are not relevant to any issue presented here.

[3] Unless otherwise indicated, all statutory references herein will be to the Revenue and Taxation Code.

pertinent here: "(a) An annual tax is hereby imposed upon every bank located within the limits of this state according to or measured by its net income, upon the basis of its net income for the next preceding income year at the rate provided under Section 23186. With respect to the taxation of national banking associations, the state adopts the method numbered (4) authorized by the act of March 25, 1926, amending Section 5219 of the Revised Statutes of the United States, Title 12, Section 548, United States Code." (§ 23181.)

"The tax imposed under Section 23181 upon banks is in lieu of all other taxes and licenses, State, county and municipal, upon the said banks except taxes upon their real property." (§ 23182.) (Motor vehicle taxes and license fees were an added exception by virtue of a 1975 amendment.)

We are here concerned with two taxes: the 11.6 percent tax paid by First City based on ordinary income under the foregoing provisions, and an additional 2.5 percent tax based on items of preference income pursuant to section 23400 et seq., which it paid under protest.

First City is a small bank, incorporated under the laws of California, with its principal place of business located in the City of Rosemead, Los Angeles County. The bank's tax return for the income year 1972, dated March 15, 1973, indicated a "Total Tax" of $63,090. Estimated tax payments of $56,800 had already been made, and according to its return the amount of the tax still unpaid was $6,200. Of this, $4,999 was the amount of tax attributable to preference income. Although the tax in dispute is relatively small, the ultimate decision here will apply to all banks in California. The bank's return included two items of tax preference[4] one for accelerated depreciation, and the other for an addition to the bank's reserves for bad debts during the calendar year. These two items are defined as follows in section 23401:

"For purposes of this chapter the items of tax preference are: (a) . . . the amount by which the deduction allowable for the income year for exhaustion, wear, tear, obsolescence, or amortization exceeds the depre-

---

[4]The tax on preference items is imposed by section 23400: "(a) In addition to the other taxes imposed by this part [part 11, Bank and Corporation Franchise Tax], there is hereby imposed for each taxable year . . . with respect to the income of every taxpayer under this part, a tax equal to 2.5 percent of the amount (if any) by which the sum of the items of tax preference in excess of thirty thousand dollars . . . is greater than the sum of the amount of net loss for the income year. . . ."

ciation deduction which would have been allowable for the income year, had the taxpayer depreciated the property under the straight line method for each income year of its useful life .... [¶] (b) In the case of a taxpayer subject to tax under Article 3 (commencing with Section 23181) of Chapter 2 of this part, the amount by which the deduction allowable for the income year for a reasonable addition to a reserve for bad debts exceeds the amount that would have been allowed if the taxpayer maintained its bad debt reserve for all income years on the basis of actual experience, as defined in Section 585(b)(3)(A) of the Internal Revenue Code of 1954. [¶] It is the intent of the Legislature that this subdivision shall apply only to new additions each year to the bad debt reserve. . . ."

Thus First City took a deduction on its return for depreciation in the sum of $9,294. This was the amount of the excess that would have been allowed if the straight line method had been used. The item for bad debt reserves amounted to $220,677. This figure represented the difference between $304,000, the amount that the bank deducted for bad debts, and $83,323, the amount it actually lost due to bad debts. Thus, the preference items came to a total of $229,971. Subtracting the $30,000 deduction authorized by section 23400, this left a net balance of $199,971 subject to the tax. Calculated on this figure at 2.5 percent, the preference tax therefore came to $4,999.

First City paid this tax under protest on the ground that this additional tax on banks is not a tax measured by net income and is therefore in conflict with former article XIII, section 16, of the Constitution, and the provisions of the Revenue and Taxation Code. Additionally, First City argues that a 2.5 percent tax on items of preference income would result in a bank being taxed at a rate in excess of the 11.6 percent limitation imposed by section 23186 as the maximum tax payable by banks on net income in 1972.

In granting Board's motion for summary judgment, the trial judge evidently rejected both of these contentions. Accordingly, we are now confronted with issues that have not been heretofore the subject of appellate review.

I

The problems to be resolved here must be considered in the historical context of the laws permitting taxation of banks. The genesis of the law

governing taxation of banks is, of course, *McCulloch* v. *Maryland,* 17 U.S. (4 Wheat.) 316 [4 L.Ed. 579], in which the Marshall court held that states could tax national banks only with the consent of the federal government as authorized by Congress. (See also *Security-First Nat. Bk.* v. *Franchise Tax Bd.* (1961) 55 Cal.2d 407 [11 Cal.Rptr. 289, 359 P.2d 625] [app. dism. and cert. den., 368 U.S. 3 (7 L.Ed.2d 16, 82 S.Ct. 15)] upholding the legality of the present tax on banks.) Congress subsequently adopted legislation consenting to taxation of national banks subject to various restrictions. Pursuant to a permissive act of Congress (R.S., § 5219; former 12 U.S.C. § 548) California by constitutional amendment in 1910 initially imposed a tax on shares of state and federal banks. The federal statute prior to 1969 listed four permissible forms of taxation, any one of which could be selected by a state, but the use of one of the alternate forms had to be *in lieu* of any other local taxes, except taxes on real property and (by a later amendment) motor vehicle license fees. One of the four specified methods was a tax "according to or measured by their net income." This was the form adopted by California when section 16 was added to article XIII of the California Constitution in 1928. The federal statute was amended to remove restrictions on taxation of national banks beginning in 1969 subject to interim federal restrictions on taxation in effect until December 31, 1972. Before the 1969 amendment, a state had the power to tax national banks only on the basis of one of the four alternative forms of taxation.

## II

First City insists that banks are exempt from a tax on preference items because it is not a tax "according to or measured by their net income" as prescribed by both the Constitution and the Revenue and Taxation Code. On the other hand, Board argues that the constitutional provision did not operate as a bar preventing the Legislature from imposing new additional taxes on banks that are not measured by income. We cannot agree with the latter proposition.

We advert again to the constitutional mandate of section 16, of article XIII. When originally adopted in 1928, section 16, paragraphs 1(a) and 1(b) read: "Notwithstanding any other provisions of this Constitution: [¶] 1. (a) Banks, including national banking associations, located within the limits of this state, shall annually pay to the state a tax according to or measured by their net income, which shall be *in lieu of* all other taxes and licenses, State, county and municipal, upon such banks, or the shares thereof, except taxes upon their real property. The amount of the tax shall be equivalent to four per cent of their net income. [¶] (b) The

legislature, two thirds of all the members elected to each of the two Houses voting in favor thereof, *in lieu of* such tax, may provide by law for any other form of taxation now or hereafter permitted by the Congress of the United States respecting national banking associations; provided, that such form of taxation shall apply to all banks located within the limits of this State." (Italics added.)

Thus, as originally adopted, paragraph 1(b) provided that the Legislature might adopt any *form* of taxation "in lieu of" the tax measured by net income imposed by paragraph 1(a). But the amendment deleted the "in lieu of" phrase from paragraph 1(b), and left it intact in paragraph 1(a). The dispute between the parties essentially involves the purpose and effect of the amendment.

Appellant bank contends that the "in lieu of" phrase was eliminated from paragraph 1(b) because it was unnecessary and confusing, and therefore redundant. Its argument is that since it is already clear from paragraph 1(a) that in taxing banks a state could resort to only one *form* of taxation permitted by federal law at a time, there was no purpose in repeating the phrase. In support of this argument, appellant points out that the 1933 amendment removed a great deal of otherwise unnecessary verbiage from section 16 and also reduced the number of subsections from five to three. According to First City, no greater significance can be given as a reason for omitting the disputed phrase from paragraph 1(b).

Contrariwise, Board argues that the "in lieu of" phrase was deleted from paragraph 1(b) in order to permit the Legislature to impose other taxes *in addition* to the tax measured by net income. The difficulty with Board's argument, however, seems to be that it ignores the literal terms of paragraph 1(a), the language of which remained unaltered. Its mandate was still very plain and unequivocal, that the tax against banks must be one measured by net income and "shall be in lieu of all other taxes and licenses, state, county and municipal, . . ." Paragraph 1(b) gave the Legislature the power to enact "any other form of taxation now or hereafter permitted by the Congress of the United States respecting national banking associations; . . ." In order to reconcile "any other form" in paragraph 1(b) with "in lieu of all other taxes" in paragraph 1(a), the word "other" in 1(b) must be construed as meaning *alternative* method, rather than an *additional* or new tax not based on net income. Thus, the tax measured by net income established in paragraph 1(a) was

the exclusive method of taxing banks[5] unless the Legislature, as empowered by paragraph 1(b), *substituted* for it another form of taxation.

### III

■ This perforce brings us to a crucial question for determination here: Is the tax on preference items one that is according to or measured by net income? Our answer is in the affirmative.

The sections imposing the preference tax (§ 23400 et seq.) are included in chapter 2.5 added to the Revenue and Taxation Code in 1971, by Statutes of 1971, Extra Session, chapter 1, page 5055. First City's argument that these provisions are in conflict with section 23182, stating that the tax imposed on banks by section 23181 shall be in lieu of all other taxes, is unavailing. The legislative intent in adding chapter 2.5 to the code is unmistakable; it intended to supplement existing statutory provisions for taxing banks by imposing a tax on preference income at a rate of 2.5 percent. But even if sections 23182 and 23400 et seq., might be said to be in conflict, the latter enactments would be controlling. Section 23182 had been in effect without amendment since 1951, whereas the sections imposing a tax on preference income were adopted 20 years later. ■ "Where the terms of a later specific statute apply to a situation covered by an earlier general one, the later specific statute controls [citation]." (*County of Placer* v. *Aetna Cas. etc. Co.* (1958) 50 Cal.2d 182, 189 [323 P.2d 753].)

■ However, as we have hereinabove held, the Constitution and the tax code do restrict taxation of banks to a tax measured by their *net income.* We now reach the further conclusion that there is a sound basis for regarding the taxation of items of preference income as part of a total

[5]See *Diamond Nat. Corp.* v. *State Bd. of Equalization,* 60 Cal.App.3d 283 [131 Cal.Rptr. 528], modified, 61 Cal.App.3d 334b, *enforcing* 425 U.S. 268 [47 L.Ed.2d 780, 96 S.Ct. 1530] (1976), holding that banks could not be compelled to pay sales tax prior to the 1969 amendments to former 12 United States Code section 548.

method of imposing a tax according to or measured by net income in compliance with the constitutional and statutory command.

When the method of taxation that California elected to follow under federal law is used, "the entire net income received from all sources," may be included, but the rate shall not be higher than the rate assessed upon other financial corporations "nor higher than the highest of the rates assessed by the taxing State upon mercantile, manufacturing and business corporations doing business within its limits." (R. S., § 5219; former 12 U.S.C. § 548.) The federal statute was "designed to allow the states considerable freedom in working out an equitable tax system, . . ." (*Security-First Nat. Bk.* v. *Franchise Tax Bd., supra,* 55 Cal.2d 407, 414.)

While the Constitution and the tax code restrict taxation of banks to a tax on "net income" there is no definition of that term in the Constitution.

We note that while the Legislature in the Bank and Corporation Tax Law (part 11) has defined net income in section 24341 of article I of chapter 7, it has also qualified that definition by creating a special segment of that net income in chapter 2.5 (§ 23400 et seq.), the tax on preference income. Chapter 2.5 makes specific reference (inter alia) to the provisions of chapter 2, article 3, entitled "Tax on Banks and Financial Corporations." It thus clearly appears that if these provisions are to be construed as a whole, the Legislature has taxed some net income at 11.6 percent (see § 23185) and some at 2.5 percent.

A bank in computing its net income certainly has no constitutional right to claim a deduction for annual additions to its reserves for bad debts far in excess of the amount which, based upon experience, become worthless, and three to five times as much as ordinary corporations are permitted to deduct for bad debt reserves. This special type of reserve for bad debts is not available to ordinary individuals or business corporations.[6] Indeed, the tax on preference income was obviously intended by

---

[6]Under Franchise Tax Board regulation 24348(b) (Cal. Admin. Code, tit. 18, Reg. 24348(b)), banks and financial institutions can claim an annual addition to bad debt

the Legislature to offset some of the tax advantages that had been given to banks and financial institutions.

Under any concept of "net income" a bank could at most deduct its actual bad debt losses during the taxable period, not an amount for bad debt reserves that may be three to five times its actual bad debt losses.

With regard to the second item of preference income, accelerated depreciation,[7] both banks and ordinary corporations may claim depreciation on the straight line method or take advantage of accelerated depreciation. If the latter method is chosen the taxpayer will, after the $30,000 exclusion, pay a tax at the rate of 2.5 percent on the amount by which the amount claimed as accelerated depreciation exceeds the depreciation that it would be entitled to take under the straight line method. But, as Board points out in its supplemental letter brief, by taking accelerated depreciation, the taxpayer can immediately take a larger deduction, thus paying tax at a 2.5 percent rate on net income which during the period here involved would otherwise be subject to a 7.6 percent rate in the case of ordinary corporations, and an 11.6 percent rate for banks.

Chapter 2.5 is in effect a limitation on the deductibility of the enumerated preference income. We agree with respondent Board that this method of limiting deductibility in no way makes the tax one other than one imposed on net income. The Legislature, of course, could have completely eliminated the right to deduct such preference items in their entirety and have taxed such income at the full bank rate. Instead, in taxing preference income at the 2.5 percent rate Board is in actuality only recapturing part of the tax at a much lower rate. It appears to be a valid method of taxation primarily designed to reduce to some extent the tax advantages enjoyed by banks and financial institutions due to the special privilege that they have been given.

---

reserves sufficient to bring the reserve up to the level of three to five times the average six-year bad debt experience of the bank in relation to its outstanding loans. The nature of the loans involved determines whether a multiplier of three to five is used. By segregating the loans a bank may use a multiplier of five as to some and three as to others. The difference between this addition to the reserve based on the regulation and the actual bad debt experience of the banks is taxed as an item of preference income at the 2.5 percent rate. By virtue of the multipliers, as long as the bank remains in operation, there is a substantial difference between the deduction which banks and savings and loan associations can claim as an addition to the reserve for bad debts and the amount of their actual bad debt experience. This difference will never be taxed at the 11.6 percent rate but only at the 2.5 percent rate applicable to preference income.

[7] Of the approximately $230,000 of preference income here involved, only about $9,300 was related to accelerated depreciation.

■  Generally, the Legislature is supreme in the field of taxation and as a result constitutional restrictions on the power of the Legislature must be strictly construed against the limitation. (*Delaney* v. *Lowery* (1944) 25 Cal.2d 561, 568 [154 P.2d 674]; see also *Lundberg* v. *County of Alameda* (1956) 46 Cal.2d 644, 652 [298 P.2d 1] [app. dism. 352 U.S. 921 (1 L.Ed.2d 157, 77 S.Ct. 224)].)  ■  In our opinion, the imposition of the tax on items of preference income of banks therefore in no way conflicts with the constitutional and statutory intent that the tax on a bank be "according to or measured by their net income."

IV

■  First City's final contention is that the cumulative effect of the taxes levied by article 3 of chapter 2 (§§ 23182-23187) and chapter 2.5 (§§ 23400-23403) somehow results in a tax in excess of the maximum rate of 11.6 percent prescribed by section 23186. We are unable to agree.

There is no conflict between section 23186 with the provisions of chapter 2.5. Construing the statutes as they then existed together, it appears that the Legislature intended to amend the basic law relating to taxation on banks to include a tax on preference income. Some net income is taxed at 11.6 percent and some (preference income) at the much lower rate of 2.5 percent. The latter would have been taxable at the maximum bank rate for banks if it had not been for the special treatment that the Legislature gave to preference income.

First City suggests that it is possible that due to an earlier passage of the period in which depreciation may be taken, or because of a future revision of the deduction for bad debts due to excess of reserves for bad debts, any such windfall income could be taxed twice; once initially at the 2.5 percent rate as preference income, and again in a later year at the normal rate for net income, making an aggregate tax of 14.1 percent at present rates. No problems of this kind are shown by the record on this appeal, and we are therefore not concerned here with a hypothetical case that may or may not arise at some future time. Moreover, we note that, as explained by the Attorney General, the California statutes differ from federal law in that the Bank and Corporation Law does not contain any

provisions for carry-back or carry-forward of net operating losses. Under California law net income is determined solely on the basis of the particular tax year involved, and the tax is based upon the appropriate rate for the year in which it is assessed. Hence, our statutes do not contemplate a tax on items of income at a composite tax rate based upon cumulative calculations over a period of years.

For the foregoing reasons, the judgment is affirmed.

Sims, Acting P. J., and Elkington, J., concurred.

A petition for a rehearing was denied June 27, 1977, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied August 4, 1977. Bird, C. J., did not participate therein. Sullivan, J.,* participated therein.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.